**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AMERICAN IMPORT-EXPORT
OF GOODS, LLC, a Florida Limited
Liability Company, MIRCEA E.
HALMAJAN, managing partner,
an individual and a citizen of
Florida,

    Plaintiffs,        Case No. 08-14912

 v.

                 HON. MARIANNE O. BATTANI

WORLD OF COLORS, LLP, an
unincorporated Partnership, SAM
SOBH, DAVID T. RYDER, and
NABIL BARADA, jointly and
severally,

    Defendants.
_____/

## OPINION AND ORDER

This matter came before the Court for a bench trial on June 28, 2010, and was concluded on June 29, 2010. The Court, having considered the evidence submitted and the legal arguments of the parties, enters Findings of Fact and Conclusions of Law pursuant to FED. R. CIV. P. 52(a).

## I. PROCEDURAL BACKGROUND

Plaintiff American Import-Export of Goods, LLC (AIE) is located in Jacksonville Florida. Plaintiff Mircea Halmajan, is a Principal in AIE and the managing partner. Plaintiffs filed suit against Defendants World of Colors LLP (WOC), Sam Sobh, David T. Ryder, and Nabil Barada, alleging they failed to deliver 3600 metric tons of sunflower oil paid for by Plaintiffs and never refunded Plaintiffs' payment of $322,500 for the first delivery of 300 metric tons. In their Third Amended Complaint, Plaintiffs advance claims of breach of

contract under common law and the Uniform Commercial Code, fraud and misrepresentation, and Action on Promissory Note.

No dispositive motions were filed, and case evaluation was unsuccessful. Accordingly, this matter proceeded to a bench trial. Before the Court heard testimony, Plaintiffs moved for default judgment as to Sam Sobh. Sobh failed to appear at the final pretrial conference and was not in the courtroom at the start of trial despite notice from the Court. In addition, Sobh never provided the Court with proposed findings of facts and conclusions of law. In light of these failures, the Court granted the motion.

Sobh and his attorney appeared in the courtroom sometime after the start of trial. Sobh subsequently asked the Court to reconsider its decision, and the Court limited the default judgment to Sobh's liability.

During the course of trial, the Court heard testimony from Halmajan, Ryder, Barada, and Sobh. The Court received numerous documents, including Plaintiffs' Exhibits 1-8, 10-15 and Defendants' Exhibits 1-12, 20. Before turning to the specific factual findings regarding the agreements and status of the parties, the Court notes in general that the parties' intention to benefit financially through their relationship was undermined by inexperience in the sunflower oil market, changing market conditions, mistrust, and/or inattention to the business matters at hand.

## II. FINDINGS OF FACTS

### A. The Agreement

AIE contracted to purchase 3600 metric tons of refined Sunflower Oil from WOC. Pls.' Ex. 1. WOC agreed to deliver 300 metric tons per month at a cost per metric ton of $1075.00. Id. The contract included terms regarding the quantity, shipping date, origin, destination, type of payment, and banking details. Further, the contract required payment by an "irrevocable, confirmed, twice transferable (FFDLC) fully-funded documentary letter

of credit payable 100%." Id. Sobh signed the contract on behalf of WOC on January 25, 2008. Pls.' Ex. 2

Halmajan testified that he was unable to secure the letter of credit because the amount required by the contract was outside the reach of his client. Instead, on February 4, 2008, WOC and AIE reached an agreement that a wire transfer in the amount of $322,500 would be accepted for the first delivery in lieu of a letter of credit. Pls.' Ex. 2. Sobh signed the modification in his capacity as Vice President of World of Colors, LLP. See Ex. The amendment was made to avoid shipping delay. Id.

The following day, February 5, 2008, AIE issued a cashier's check, No. 333031, in the amount of $322,500, payable to WOC for delivery of 300 metric tons. See Pls.' Ex. 3. Halmajan delivered the check to Sobh, who handed it to Ryder.

On February 6, 2008, WOC executed a Promissory Note in the amount of $322,500, reflecting the amount of the cashier's check tendered by AIE. Pls.' Ex. 4. According to the Promissory Note it was a "good faith up front payment for 300 [metric tons] of sunflower oil as per [the] signed contract." Id. Ryder signed the Note on behalf of WOC in his capacity as President, and Sobh witnessed the signature. Although Halmajan testified that Barada also witnessed the signature, Barada was not present when the Note was signed.

Under the terms articulated in the Promissory Note, the shipment had to be completed no later than April 15, 2008, or AIE had "the right to a full refund of $322,500." Id. The Promissory Note included the following provision:

> Guaranty: We the undersigned jointly and severally guaranty the prompt and punctual payment of all moneys due under the aforesaid note and agree to remain bound until the completion of this contract

Pls.' Ex. 4.

The Promissory Note indicated that an invoice would issue for the contract, and on February 6, 2008, WOC issued an invoice in accordance with the contract for 300 [metric

3

tons] of sunflower oil. Sobh executed a "paid in full" invoice on February 6, 2008, to Plaintiffs in the amount of the cashier's check. Pls.' Ex. 6.

Because the price of sunflower oil was rising, Plaintiffs entered into a second contract with WOC to purchase and additional 2400 metric tons of sunflower oil at the same price before the first shipment ever was delivered. Pls.' Ex. 6. On March 25, 2008, Halmajan made arrangements to wire $7,000 to WOC. Pls.' Ex. 7. The wire transfer secured an additional year's supply of sunflower oil.

Because delivery of the first shipment was not made by April 15, 2008, WOC made arrangements for Barada and Halmajan to travel to Poland to speak directly with the supplier. Defs.' Ex. 4. Halmajan understood that he needed to have the contracts and letters of credit for the overseas contact to review. See Defs.' Ex. 4 (email). At that time, AIE's contact had the funds available for a second order of 600 metric tons. Id. Barada and Halmajan then traveled to Poland, Romania, and Bulgaria looking for sunflower oil; however, none was located at an acceptable price. Defendants testified that the price increased because the fully-funded Letter of Credit was not received.

Consequently, Plaintiffs demanded that their money be returned. Defendants failed to refund the money. Although there was testimony that WOC sent part of the money overseas as a deposit for the sunflower oil, there was no documentation offered to support this assertion.

### B. Mitigation

Although WOC never delivered the sunflower oil and never refunded the money, WOC and AIE continued to work together to resolve their dispute. In an effort to mitigate, the parties discussed whether Plaintiffs' principal would agreed to accept paint or wood. On June 30, 2008, Halmajan informed WOC that his principal would take paint in lieu of the oil. Pls.' Ex. 12. Again in an email dated August 25, 2008, Halmajan affirms that paint could be sent in lieu of the money owed. Defs.' Ex. 2.

WOC did ship three containers of paint overseas, valued at $118,000.  See Defs.' Exs. 10-12.  However, Plaintiffs' principal never received the paint because of disputes as to who was to pay freight, and whether it was paid, as well as unpaid storage fees.  Pls.' Exs. 14-15.  WOC provided packing slips showing that paint was to be shipped to Romania and indicates that freight to destination as a courtesy service was to be paid by WOC.  Defs.' Exs. 10-12.  According to Halmajan, he contacted the shipping company, Globe Runners, but was unable to secure delivery of the paint without a payment.  Although the parties provided shipping documents, there was no testimony from a representative of the shipping company regarding payments made or other fees that had to be paid prior to release of the paint.

### C. Status of Defendants

#### 1. David Ryder and Sam Sobh

Individual defendants Sobh and Ryder decided to go into business together in late 2007.   Ryder funded WOC with an initial investment of $125,000 to $130,000.  Ryder was the President of WOC, and Sobh, who had international contacts,  was the Vice President. Ryder testified that the two were 50/50 partners.

#### 2. Nabil Barada

Halmajan testified that he believed Barada was a partner because Barada was involved in the initial negotiations of the contract.  In addition, Distributorship Agreements, dated Feb. 1, 2008, and April 3, 2008, designate Barada as Officer/VIP Global Sales, see Pls.' Exs. 10, 11.  Moreover, Ryder identified Barada as an owner of WOC in answers to interrogatories.

Nevertheless, Barada did not sign the contract or the Promissory Note.  He had no signatory authority on the bank accounts.  The evidence shows that Barada was recruited to set-up paint manufacturing machinery for WOC.  WOC purchased paint from Barada's former employer, then WOC processed the paint, labeled it, and sold it overseas.

5

The Court finds that Plaintiffs failed to establish that Barada was a partner or an owner. The documents and testimony establish that he was merely a plant manager/salesman, receiving a monthly salary and expenses for international and domestic travel.

### 3. World of Color

Neither Ryder nor Sobh presented any document establishing their business, World of Color, as a limited liability partnership. Ryder testified that he did not have a copy because Sobh was completing the process. Sobh testified that a flood destroyed his paperwork.

Although Defendants submitted several documents to show WOC's status as a limited liability partnership, the Court finds the documents only create ambiguity as to its status. The Application to Register a Limited Liability Partnership indicates that WOC's business was packaging, marketing, and export. Defs.' Ex. 4. Although both Sobh and Ryder signed the Application to Register, it is not dated and was never filed. Id. The Application identifies Business Filings Incorporated as the registered agent, and Defendants also submitted an e-mail dated September 13, 2007, showing that BixFilings received payment and would act as the registered agent for service in Michigan. Dfs.' Ex. 1.

In contrast to these documents, in others dated after the September 13, 2007, e-mail, including the second contract for sunflower oil, and the February 1, 2008, Distributorship Agreement, WOC is identified as a division of TCI Commodities Inc., a company owned by Sobh. See Pls.' Exs. 6, 10, 11. Sobh testified that WOC is not a division of TCI; he intended to put the two companies together, but he never did.

Defendants also provided a copy of a internet search showing a Michigan State Tax Lien on World of Colors LLC from December 14, 2009, and April 5, 2010, and that WOC

had a federal employer identification number. Defs.' Ex.1. Finally, Defendant provided a Form 1096 showing World of Colors, LLC filed a tax return. Defs.' Ex. 20.

None of the documents submitted, standing alone, establish that Defendants actually filed the application. Moreover, Halmajan conducted an entity search on line, but could not locate Defendant World of Colors, LLP. The Court finds that the documents, even when viewed together, show that World of Colors, LLP was never a registered limited liability partnership.

### III. CONCLUSIONS OF LAW

#### A. JURISDICTION

This Court has jurisdiction to resolve this case pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of Florida; Defendants are citizens of Michigan; and the amount in controversy exceeds the statutory requirement of $75,000.

#### B. GOVERNING LAW

The parties agree that Michigan law governs the dispute.

#### C. CAUSES OF ACTION

##### 1. Breach of Implied Contract

In Ordon v. Johnson, 77 N.W.2d 377, 383 (Mich. 1956), the state Supreme Court noted the long standing rule that the existence of a valid express contract excludes recovery on quantum meruit on an implied contract theory. Accordingly, Plaintiffs cannot succeed on their implied contract claim inasmuch as the parties had an express contract for the sale and purchase of sunflower oil.

##### 2. Breach of Contract

The Uniform Commercial Code (UCC), MICH COMP. LAWS § 440.1101 et seq., applies to the sale of goods. Under the UCC "[t]he obligation of the seller is to transfer and

deliver and that of the buyer is to accept and pay in accordance with the contract." § 440.2301.

Although WOC failed to deliver the sunflower oil as required under the parties' agreement, the Court finds that Plaintiffs' breach of contract claim fails because they breached the contract when they were unable to provide a fully-funded letter of credit, the required method of payment under the agreement. Because the parties were eager to do business, they nevertheless continued to search for sunflower oil at the agreed upon price; however, there was no longer a contractual obligation for Defendants to provide the oil at that price.

### 3. Fraud and Misrepresentation

The economic loss doctrine, which Michigan has adopted "bars tort recovery and limits remedies to those available under the Uniform Commercial Code where a claim for damages arises out of the commercial sale of goods and losses incurred are purely economic." Neibarger v. Universal Coops., Inc., 486 N.W.2d 612, 613 (Mich. 1992). The economic loss doctrine prevents contract law from "drown[ing] in a sea of tort law." Neibarger, 486 N.W.2d at 618 (quoting East River Steamship Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 866 (1986)). Accordingly, Plaintiffs may not maintain a fraud claim based on Defendants' failure to fulfill a promise that is "interwoven with the breach of contract." Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc., 532 N.W.2d 541, 545 (Mich. Ct. App.1995). Therefore, Plaintiffs' fraud claim fails.

Even if claim of fraud were available to Plaintiffs, they could not establish the elements. To succeed on a fraud claim, a plaintiff must prove:

> (1) That defendant made a material representation; (2) that was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813 (Mich. 1976). Moreover, each element must be proven with a reasonable degree of certainty. Id. Finally, a plaintiff must meet his burden with "clear, satisfactory and convincing evidence." Id.

In this case, the Court finds that Defendants had every intention of fulfilling their contractual obligations when the agreement was signed. To the extent that Defendants may have oversold their experience, the Court finds no action for fraud. Van Tassel v. McDonald Corp., 407 N.W.2d 6 (Mich. Ct. App. 1987). As a buyer, Plaintiff should have done their due diligence. Accordingly, even if such a claim were available to Plaintiffs, it would fail.

### 4. Exemplary damages

At the outset the Court observes that Michigan does not recognize a cause of action for exemplary damages because exemplary damages are a form of actual damages, not a separate claim. Fonstad v. Teal, No. 254051, 2005 WL 1705514, at *5 (Mich. Ct. App. July 21, 2005) (dismissing claim for exemplary damages because "exemplary damages are simply a form of actual damages. . .[i]t does not constitute a separate claim.").

Moreover, these damages are not available given the facts of this case. In Michigan, the general rule is that exemplary damages are not available in an action for breach of a commercial contract absent proof of tortious conduct independent of the breach. Kewin v. Massachusetts Mut. Life Ins. Co., 409 Mich. 401, 420-421, 295 N.W.2d 50 (1980); Tempo, Inc. v. Rapid Elec. Sales & Serv., Inc., 347 N.W.2d 728 (Mich. Ct. App. 1984). Here, there was no independently existing tortious conduct.

### 5. Action on Promissory Note (Sum Certain)

The parties agreed that a promissory note would be accepted in lieu of a letter of credit, and there is no dispute that WOC was required to refund $322,500 to Plaintiffs. Although Defendants advanced several defenses, none provides a basis for a reduction in the amount owed pursuant to the Promissory Note.

### a. Mitigation

Bulk paint sent as a substitute product with Plaintiffs' approval. Here, Plaintiffs' client never received the paint, and Defendants failed to meet their burden to show mitigation given the conflicting evidence presented–the invoices, e-mails, and testimony.

### b. Interference

Halmajan's trip to Poland did not constitute interference with the contract agreements made in the Promissory Note. Therefor, reliance on Stanton v. Dachille, 463 N.W.2d 479, 484 (Mich. Ct. App. 1990), is misplaced.

> Where a contract is performable on the occurrence of a future event, there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event, particularly where it is dependent in whole or in part on his own act; and, where he prevents, hinders, or renders impossible, the fulfillment of a condition precedent or its performance by the adverse party, or is himself the cause of failure to perform the condition, he cannot rely on such condition to defeat his liability.

Halmajan's trip to Poland did not create Defendants' failure to perform. He traveled to Eastern Europe only after delivery did not occur. Moreover, there is no evidence that Halmajan stole Defendants' suppliers.

### c. Guarantee

Halmajan testified that he understood the guaranty to be binding on all three individual defendants. The document was drawn up so he would have no fear of doing business with WOC. Halmajan's understanding does not alter the signature and designation that appear on the document. Ryder signed the guaranty in his capacity as president of WOC. But see Kroll v. Crest Plastics, Inc., 369 N.W.2d 487 (Mich. Ct. App. 1985) (holding that parole evidence was admissible to establish personal liability of an individual who signed in his representative capacity given the language "we promise to pay").

In this case, Sobh's liability cannot be contested because the Court granted Plaintiff's request for default judgment. Although Kroll suggests that the Court could hold

Ryder personally responsible based upon the language of the guarantee, here, the Court focuses its attention on the status accorded WOC to assess the liability of Ryder.

### D. Individual Liability

Under Michigan law, for a partnership to organize as a limited liability partnership **it must file** a registration, which is "effective immediately upon filing and payment of the registration fee." See MICH COMP. LAWS § 449.46. Defendants provided no evidence to support WOC's existence as a limited liability partnership in compliance with state law. Accordingly, the Court finds WOC was not a limited liability partnership during the time the Promissory Note was breached. This finding requires the Court to consider whether WOC should be accorded de facto limited liability partnership status.

### 1. De Facto Limited Liability Partnership

Even if Michigan allows de facto status to a limited liability entity, the elements are not met in this case. See Duray Development, LLC v. Perrin, No. 287722, 1020 WL 1461616 (Mich. Ct. App. April 13, 2010) (discussing the application of the doctrine to a limited liability company). In assessing whether a de facto corporation exists, courts assess four elements: whether incorporators have proceeded in good faith; whether a valid statute exists; for an authorized purpose; and whether the incorporators have executed and acknowledged the articles of association pursuant to that purpose. Id. (citing Newcomb-Endicott Co., 133 N.W. 540 (Mich. 1911)).

Here, the Court does not find Sobh acted in good faith. There is no evidence that he ever made an effort to file his application, and the Court finds his testimony in that regard to be evasive and unbelievable. Throughout the brief life of WOC, there was no consistent recognition, designation, or treatment of WOC as a limited liability company. This failure, in addition to Sobh's conduct relative to the Promissory Note, show Sobh's lack of good faith. Specifically, Sobh and Ryder led Halmajan to believe that they personally guaranteed the Promissory Note.

11

Ryder's conduct likewise fails to show good faith regarding WOC's status as a limited liability partnership, only willful ignorance. He never saw a completed filing. He identified Barada as a partner at one point during this litigation, showing his lack of even basic knowledge of WOC's business dealings. Finally, the testimony shows he did as Sobh instructed him to do without question. Ryder's interest was limited to making money. Because the Court finds that WOC was not a de facto limited liability partnership, it addresses liability under partnership law.

### 2. Partnership Law

The Uniform Partnership Act defines a partnership as "an association of 2 or more persons. . .to carry on as co-owners a business for profit." MICH COMP. LAWS § 449.6. As the Michigan Supreme Court noted in Byker v. Mannes, 641 N.W.2d 210 (Mich. 2002), this definition "is devoid of any requirement that the individuals have the subjective intent to create a partnership." Id. at 215. Therefore, "if the parties associate themselves to 'carry on' as co-owners a business for profit, they will be deemed to have formed a partnership relationship regardless of their subjective intent to form such a legal relationship." Id. In other words, "the statute does not require partners to be aware of their status as 'partners' in order to have a legal partnership." Id.

Here, there is no question that Sobh and Ryder intended to operate WOC as a business for profit as co-owners. Therefore, they were partners under the governing statute. Moreover, under the statute, partners are jointly and severally liable for wrongful acts committed by a copartner. MICH COMP. LAWS §§ 449.13, 449.15(a). Specifically, the language in § 449.13 reads, "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business or the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the

partner so acting or omitting to act." In addition, all partners are liable, jointly and severally for "everything chargeable to the partnership under § 449.15(a).

Given the law governing partnership, Ryder's request for equitable indemnification form Sobh and Barada based on Ryder's lack of knowledge of the specifics of this deal lacks merit. Ryder is responsible for the money owed pursuant to the Promissory Note.

## IV. CONCLUSION

In conclusion the Court holds that Plaintiffs are entitled to judgment on their claim pursuant to the Promissory Note. Therefore, judgment is **GRANTED** against Defendants WOC, Ryder, and Sobh and in favor of Plaintiffs in the amount of $322,500.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATE: October 8, 2010

## CERTIFICATE OF SERVICE

A copy of this Order were e-filed and/or mailed to counsel of record on this date.

s/Bernadette M. Thebolt
Case Manager